UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GERARD ENGELHARD,                    )
                                     )
         Plaintiff,                  )
                                     )
vs.                                  )    Case No. 4:14CV1940 ACL
                                     )
CAROLYN W. COLVIN,                   )
Acting Commissioner of Social Security,  )
                                     )
         Defendant.                  )

## MEMORANDUM AND ORDER

Plaintiff Gerard Engelhard brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration Commissioner's denial of his application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental

Security Income ("SSI") under Title XVI of the Act.   Engelhard alleged that he was disabled

because of "mental and emotional problems."   (Tr. 423.)

An Administrative Law Judge (ALJ) found that, despite Engelhard's severe impairments

of adjustment disorder, major depressive disorder with anxiety, and chronic obstructive pulmonary

disorder ("COPD"), he was not disabled as he had the residual functional capacity ("RFC") to

perform jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is

presented in the parties' briefs and is repeated here only to the extent necessary.

## I.   Procedural History

On April 20, 2009, Engelhard filed applications for DIB and SSI, claiming that he became

unable to work due to his disabling condition on February 20, 2009.  (Tr. 328-34, 335-37).

Engelhard's claims were denied initially.  (Tr. 157-61.)   Following an administrative hearing,

Engelhard's claims were denied in a written opinion by an ALJ, dated January 7, 2011.   (Tr.

118-27.)

On September 13, 2011, the Appeals Council granted Plaintiff's request for review and

remanded the claim back to the ALJ for further proceedings.   (Tr. 132-33.)   The ALJ was

directed to give further consideration to Engelhard's RFC and, if warranted, obtain supplemental

evidence from a vocational expert.   *Id.*   On December 14, 2011, after holding a supplemental

hearing, the same ALJ issued a new decision finding that Engelhard was not disabled.   (Tr.

138-47.)

On December 27, 2012, the Appeals Council again granted Engelhard's request for review,

this time based on new and material evidence.   (Tr. 154-55.)   The Appeals Council indicated that

Engelhard's attorney had submitted a medical source statement from treating physician Chinya

Murali, M.D., dated May 4, 2012, in which he found severe limitations.   (Tr. 154.)   The ALJ was

instructed to consider the treating source opinion, further develop the record if necessary, reassess

Engelhard's RFC, and obtain supplemental evidence from a vocational expert if necessary.   (Tr.

154-55.)   On October 25, 2013, following two additional hearings, a different ALJ again found

that Engelhard was not disabled.   (Tr. 15-30.)

Engelhard then filed a request for review of the ALJ's decision with the Appeals Council of

the Social Security Administration (SSA), which was denied on September 25, 2014.   (Tr. 1-6.)

Thus, the October 25, 2013 decision of the ALJ stands as the final decision of the Commissioner.

*See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Engelhard first claims that the ALJ failed to properly assess Engelhard's impairments and failed to consider his need to be in a group home following his hospitalization in September 2011. Engelhard next argues that the ALJ failed to properly consider whether he met or equaled Listing 12.04. Finally, Engelhard argues that the ALJ erred in disregarding the opinion of treating psychiatrist Dr. Murali.

## II. The ALJ's Determination

The ALJ found that Engelhard meets the insured status requirements of the Social Security Act through September 30, 2011, and that he has not engaged in substantial gainful activity since his alleged onset date of February 20, 2009. (Tr. 18.)

In addition, the ALJ concluded that Engelhard's adjustment disorder, major depressive disorder with anxiety, and COPD[1] were severe impairments. *Id.* The ALJ found that Engelhard did not have an impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

As to Engelhard's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant should avoid concentrated exposure to fumes, odors, dust, and gases. Furthermore, the claimant is able to understand and carry out simple instructions and non-detailed tasks. The claimant can demonstrate adequate judgment to make simple work-related decisions. The claimant can respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent. The claimant can adapt to routine/simple work changes. The claimant should not work in a setting that includes constant/regular contact with the general public. The claimant should not perform work that includes more than infrequent

---

[1]Engelhard does not dispute the ALJ's findings regarding his physical impairment. As such, the Court will not discuss medical evidence pertaining to Engelhard's COPD.

handling of customer complaints.

(Tr. 21.)

The ALJ found that Engelhard's allegations regarding his limitations were not credible. (Tr. 22-23.)   The ALJ assigned little weight to the opinion of treating psychiatrist Dr. Murali because they were not supported by the evidence, including Dr. Murali's own treatment notes. (Tr. 25.)

The ALJ further found that Engelhard was unable to perform any past relevant work.   (Tr. 28.)   There were other jobs, however, that exist in significant numbers in the national economy that Engelhard could perform.   *Id.*   The ALJ therefore concluded that Engelhard has not been under a disability, as defined in the Social Security Act, from February 20, 2009, through the date of this decision.   (Tr. 29.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on April 19, 2009, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income protectively filed on April 19, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 30.)

## III.   Applicable Law

## III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a

preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted).   *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

### III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's

physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to meet the physical, mental,

sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of

production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity (RFC) assessment. *See* 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## IV. Discussion

As noted above, Engelhard raises three claims in this action for judicial review of the ALJ's decision denying benefits, including: the ALJ failed to properly assess his mental impairments and failed to consider his need to be in a group home following his hospitalization in September 2011; the ALJ failed to properly consider whether he met or equaled Listing 12.04; and the ALJ erred in disregarding the opinion of treating psychiatrist Dr. Murali. The undersigned will discuss Engelhard's claims in turn.

### IV.A. Engelhard's Residence in a Group Home

Engelhard first argues that the ALJ failed to properly assess his impairments and consider his need to be in a group home following his hospitalization in September 2011. Specifically, Engelhard notes that the ALJ assessed mild restrictions in activities of daily living and, in doing so, recited activities Engelhard endorsed in a May 2009 function report. Engelhard contends that the ALJ failed to inquire about or discuss his activities after May of 2009.

Defendant argues that the ALJ properly considered Engelhard's 2009 function report, as it was made during the relevant time period. Defendant further argues that, although Engelhard was living in a group home at the time of the decision, he moved there because he was homeless and not due to medical need. Defendant also contends that the ALJ properly found that Engelhard's subjective complaints were not credible.

As an initial matter, Engelhard alleged an onset of disability date of February 20, 2009. (Tr. 328, 335.) His insured status expired on September 30, 2011. (Tr. 18.) To be entitled to benefits under Title II, Engelhard had to demonstrate he was disabled prior to September 30, 2011. *See* 20 C.F.R. § 404.130. To be entitled to SSI benefits under Title XVI of the Act, Engelhard must show that he was disabled while his application was pending. *See* 42 U.S.C. § 1382c; 20

C.F.R. §§ 416.330, 416.335.   Thus, the relevant time period in this case is from Engelhard's alleged onset date of February 20, 2009, through October 25, 2013, the date of the ALJ's decision.

Engelhard completed an "Adult Function Report" on May 12, 2009, approximately three months after his onset date.   (Tr. 434-41.)   In assessing Engelhard's limitations in activities of daily living at steps two and three, the ALJ noted that Engelhard reported in his Function Report that he has some problems with personal care, such as bathing and shaving; however, he is able to prepare his own meals, clean, do laundry, mow the yard, plant flowers, go fishing two or three times per week, and is able to drive without difficulties.   (Tr. 19.)   The ALJ also cited a note from Engelhard's September 2011 psychiatric hospitalization, in which he reported that he fished two to three times a week.   (Tr. 1112.)   The ALJ concluded that Engelhard has only a mild limitation in activities of daily living.   *Id.*

The ALJ properly considered Engelhard's statements in his May 12, 2009 Function Report, as these statements were provided during the relevant period.   Engelhard also reported in his Function Report that he was living with family, and that he required reminders for his personal needs and grooming and to take his medications.   (Tr. 436.)

Engelhard was admitted at the Veteran's Administration ("VA") hospital from August 30, 2011, through September 20, 2011, due to exacerbation of his depression.   (Tr. 919.)   Engelhard was brought to the emergency department by his son after he was evicted from his residence, and was found crying in his car.   (Tr. 980.)   Engelhard had expressed a desire to harm VA staff.   *Id.* During his admission, Engelhard was disheveled and reported suicidal and homicidal ideation. (Tr. 941.)   Engelhard was noted to have an extensive history of alcohol dependence.   (Tr. 980.) Engelhard initially denied problems with alcohol, but later acknowledged that his "occasional beers" were still problematic.   (Tr. 1038.)   He was diagnosed with depression, with a GAF score

of 44.[2]  (Tr. 942.)  Engelhard's symptoms gradually cleared with medication adjustments.  (Tr. 1035-39.)  On September 16, 2011, it was noted that the ability of Engelhard and his family to manage his care post-discharge was poor, and that there was a need for referrals post-discharge. (Tr. 1099-1100.)  Engelhard was accepted for admission to House, Inc., a residential treatment facility for alcoholics, on the day of discharge (September 20, 2011).  (Tr. 1038.)

In approximately December of 2011, Engelhard was placed at Harvester Residential ("Harvester"), a group home facility described by the provider as a "supported independent community."  (Tr. 485, 1181.)  Engelhard continued to live at Harvester through the date of the ALJ's decision (October 25, 2013).  Gregory Gettman, the director of Harvester, testified at the May 22, 2013 administrative hearing.  (Tr. 72-76.)  Mr. Gettman explained that Engelhard lives in the "independent community" of Harvester, which is group living for seniors and people with mental disabilities.  (Tr. 75-76.)  In the independent community, Harvester assists residents with medication management, and activities of daily living such as hygiene care and cleaning their rooms.  (Tr. 76.)  Harvester also provides meals, grocery shopping services, and arranges doctor visits.  *Id.*  Mr. Gettman testified that he sets up residents' medications for a couple days at a time and then checks on residents daily.  *Id.*  Another administrator from Harvester, Jennifer Gettman, testified at the September 25, 2013.  (Tr. 19-22.)  Both witnesses testified that Engelhard is unable to care for himself independently.  (Tr. 73, 60.)  They testified that Engelhard requires assistance getting out of his room when he is depressed, assistance with hygiene, and assistance with his medications.  *Id.*

In addition, Andria Damrell, Assistant Administrator at Harvester, authored a letter to the

---

[2] A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("*DSM IV-TR*").

SSA in which she stated that she was "adamant in helping [Engelhard] with his efforts in activating his benefits so we can continue to provide him with his medical care." (Tr. 485.) Ms. Damrell stated that Engelhard suffers from severe depression, anxiety, and hallucinations, and remains very reclusive daily due to these conditions. *Id.* She stated that Engelhard relies on the professional medical team at Harvester reinforcing the importance of this therapy, and medication regimen. *Id.* Ms. Damrell stated that, if Engelhard did not start receiving financial assistance, Harvester would be unable to continue providing care. *Id.*

The ALJ did not discuss Engelhard's activities of daily living since he has lived at Harvester following his September 2011 hospitalization. The ALJ did refer to Harvester later in his opinion on two occasions. First, when discussing the medical opinion evidence, the ALJ noted that Mr. Gettman, Ms. Gettman, and Ms. Damrell had provided reports that are supportive of Engelhard's allegations, but do not establish that Engelhard is disabled for the following reasons: (1) they are not acceptable medical sources; (2) they are not disinterested parties as Harvester has a financial stake in the outcome of this case; and (3) the reports are not supported by the medical evidence of record. *Id.* Next, at the end of the ALJ's discussion regarding Engelhard's RFC, the ALJ stated as follows:

> The undersigned is sympathetic to the homeless and admires private facilities that provide shelter and structure to them. However, neither is an acceptable basis to arrive at a finding of disability. Just because a private agency lends a helping hand does not mean the recipient is totally disabled. Other factors can come into play such as the economy, a lack of available work in a specific field, and a lack of transportation.

(Tr. 27.)

Although the ALJ made multiple references to Harvester as an "independent group home" (Tr. 15, 26), the ALJ implies that Engelhard is residing there because he was homeless rather than

any medical needs.   This finding is not supported by substantial evidence.   The ALJ's consideration of Englehard's placement at Harvester focuses solely on his homelessness status rather than Englehard's difficulties with activities of daily living described by not only the Harvester administrators and Dr. Murali, but also the VA treating professionals and Englehard's family.   The record does not support a view that Harvester is a homeless shelter.   When asked to explain how Harvester was different from an assisted living facility, Mr. Gettman indicated the primary difference was that assisted living facilities provide 24-hour care.   *Id.*   He added the following:

> [t]he biggest difference would be that in the independent community I set up their medications for a couple of days at a time, three to five days generally; and then we check on them daily; whereas in the assisted living facility we are legally obligated to hand them their medications every single time.

*Id.*

Defendant points out that Engelhard testified that he began residing at Harvester because he was homeless and had nowhere else to go.   Defendant contends that there was "little indication" that Engelhard was required to live in such a facility because he was incapable of caring for himself, and notes that Engelhard lived independently for several years during the relevant period.

It is true that Engelhard testified at the May 22, 2013 hearing that he was living at Harvester because he "was homeless and [had] nowhere else to go."   (Tr. 69.)   Engelhard testified that, prior to living in residential homes, he lived with his son-in-law.   (Tr. 71.)   There is no doubt that Engelhard had no place to live when he was discharged from the VA hospital after his psychiatric admission in September 2011.

The records from the VA upon discharge also indicate that a finding was made that the ability of Engelhard and his family to manage his care post-discharge was poor.   (Tr.

1099-1100.)   It was noted that Engelhard continued to isolate himself during his hospitalization, interacting with neither peers nor staff; and that his appearance was disheveled and his hygiene was poor.   (Tr. 1099.)   The nursing staff had been assisting with Engelhard's grooming and hygiene, interrupting psychotic behavior, involving Engelhard in reality-based activities, and offering medications when indicated.   (Tr. 1100.)   Engelhard had previously lived with his son-in-law but he could no longer reside there.   For these reasons, following Englehard's discharge in September 2011, the VA assisted with the placement of Engelhard in a residential alcohol treatment facility, House, Inc.   (Tr. 1038.)   Around December of 2011, Englehard moved to Harvester.   (Tr. 485.)

There are no medical records or other documentation accompanying Engelhard's subsequent placement at Harvester.   There is significant evidence in the record, however, that Engelhard had difficulty with his activities of daily living, including maintaining personal hygiene and remembering to take his medications.   Engelhard's testimony that he resides at Harvester because he was homeless and needed a place to live is accurate, in that Engelhard no longer had family members willing to assist with his care.   Engelhard's own statements in his Function Report reveal that his family members had been assisting him by reminding him regarding his hygiene and his medications.   Engelhard does not reside at a homeless shelter, but in a residential facility for individuals with mental impairments.   Thus, the ALJ erred in characterizing Harvester as a homeless shelter.

Defendant argues that the ALJ's statements regarding Harvester and findings regarding Engelhard's activities of daily living are proper because the ALJ found that Engelhard's subjective complaints were not credible.   Engelhard does not challenge the ALJ's credibility analysis, and the undersigned will therefore only discuss the ALJ's key credibility findings that

are relevant to Engelhard's claims.

The ALJ pointed out that the VA providers "considered a diagnosis of malingering" during Engelhard's September 2011 hospitalization. (Tr. 24, 911.) This diagnosis was considered because Engelhard's son reported that Engelhard's friend advised Engelhard that his VA disability claim would be approved if he remained hospitalized for thirty days. *Id.* The ALJ also noted that Engelhard made inconsistent statements to providers during his hospitalization regarding whether his medications were working and regarding his alcohol consumption. *Id.* It was proper for the ALJ to consider this evidence, although it is significant that Engelhard was not ultimately diagnosed with malingering.

The ALJ also noted that Engelhard has been noncompliant with medication, which contributed to his depressive episodes. (Tr. 24.) The record does note that Engelhard had not been compliant with his psychotropic medications during the time period preceding his August 2011 hospitalization. (Tr. 24, 979, 1030.) Engelhard's son-in-law reported that Engelhard had not taken his psychotropic medications for several months and "does not take care of himself." (Tr. 980.) He stated that Engelhard has to be continuously reminded to eat, take medications and tend to personal hygiene. *Id.* "[F]ederal courts have recognized a mentally ill person's noncompliance…can be, and usually is, "the result of [the mental impairment [itself]] and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (citations omitted). Here, there is no indication that the ALJ considered whether Engelhard's noncompliance could be attributed to his mental impairments.

In sum, Engelhard suffers from mental impairments and experiences significant symptomatology from these impairments. Engelhard resides at a group living facility where he receives assistance with activities of daily living and medical care. The ALJ erred in failing to

consider Engelhard's activities of daily living since he began living at Harvester and in characterizing Harvester as a homeless shelter.   The ALJ's error cannot be excused by his finding that Engelhard was not credible.

## IV.B.   Listing 12.04

Engelhard next claims that the ALJ failed to properly discuss the "C criteria" under Listing 12.04.

Under Listing 12.04, an affective disorder is presumptively disabling if "A" criteria and "B" criteria are met, or if "C" criteria are met.   20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.   "A" criteria (medical findings) are met if there is a medically-documented persistence of a depressive, manic, or bipolar syndrome.   20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(A).   "B" criteria (functional limitations) are met if there is a marked functional limitation in at least two of the following four categories: (1) daily living, (2) social functioning, (3) concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration.   20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(B).   "C" criteria are met if the disorder has been of at least two years' duration with either (1) repeated episodes of decompensation, (2) such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or (3) one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.   20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(C).

The ALJ made the following finding regarding the "C" criteria:

> The claimant fails to meet any of the above three requirements to satisfy the "C" criteria.   As previously stated, the claimant has not endured any episodes of decompensation, the claimant is able to tolerate at least a minimal increase in mental demands or change in environment, and the claimant lacks a history of an inability to function outside a highly supportive living arrangement.

(Tr. 20.)

Engelhard contends that the ALJ erred in failing to provide any discussion of his need to reside at Harvester, which is a "highly supportive living arrangement."

The regulations define "highly supportive" settings to include hospitals, halfway houses, care facilities, and personal home settings that "greatly reduce the mental demands placed on [the claimant]." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F). Harvester is a group home that provides medical care and homecare services to individuals with mental disabilities. The Court has already found that the ALJ erred in characterizing Harvester as a homeless shelter. The ALJ also erred in failing to consider whether Engelhard's residency at Harvester since December 2011 satisfies the "C" criteria of Listing 12.04.

## IV.C.  Dr. Murali's Opinion

Engelhard next argues that the ALJ's decision to disregard the opinion of treating psychiatrist Dr. Murali is not supported by substantial evidence and is based on a misapplication of the law. Engelhard also contends that the ALJ erred in relying on the opinion of state agency physician Robert Cottone.

Dr. Murali completed a Residual Functional Capacity Assessment on May 4, 2012, and on April 29, 2013. On May 4, 2012, Dr. Murali indicated that she sees Engelhard approximately once a month and that he had seen him three times. (Tr. 1144.) Dr. Murali diagnosed Engelhard with major depressive disorder with anxiety; history of alcohol abuse, abstinent; and a current GAF score of 50, with the highest GAF score in the past year of 50-60.[3] *Id.* Engelhard was

---

[3] A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *See DSM IV-TR* at 34.

taking Abilify,[4] Effexor,[5] and Remeron,[6] and was doing better with this combination of medications. *Id.* Dr. Murali noted that Engelhard's mood goes up and down and he isolates himself. *Id.* His prognosis was guarded. *Id.* Dr. Murali indicated that Engelhard exhibited the following signs and symptoms: anhedonia, decreased energy, mood disturbance, difficulty thinking or concentrating, psychomotor agitation, persistent disturbances of mood or affect, emotional withdrawal or isolation, and sleep disturbance. (Tr. 1145.) Dr. Murali expressed the opinion that Engelhard was unable to meet competitive standards in the following abilities: work in coordination with others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically-based symptoms, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, understand and remember detailed instructions, and carry out detailed instructions. (Tr. 1146-47.) Engelhard was seriously limited but not precluded in the following areas: maintain attention for two-hour segments, maintain regular attendance and be punctual within customary tolerances, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, deal with normal work stress, be aware of normal hazards and take appropriate precautions, set realistic goals or make plans independently of others, deal with stress of semi-skilled and skilled work, interact appropriately with the general public, and maintain socially appropriate behavior. *Id.* Finally, Dr. Murali found that Engelhard's impairments would cause him to be absent from work more than four days per month, and that Engelhard was not a malingerer. (Tr. 1148.)

---

[4] Abilify is an atypical antipsychotic indicated for the treatment of schizophrenia. *See Physician's Desk Reference ("PDR")*, 1918 (70th Ed. 2016).
[5] Effexor is indicated for the treatment of depression. *See* WebMD, http://www.webmd.com/drugs (last visited February 3, 2016).
[6] Remeron is indicated for the treatment of major depressive disorder. *See PDR* at 1534.

On April 29, 2013, Dr. Murali assessed a current GAF score of 50-60, and a highest GAF score in the past year of 70-80.   (Tr. 1181.)   Dr. Murali's opinions regarding Engelhard's limitations remained generally the same, although he found that Engelhard was now unable to meet competitive standards in the following abilities: sustain an ordinary routine without special supervision, accept instructions and respond appropriately to criticism from supervisors, and deal with normal work stress.   (Tr. 1184.)   Dr. Murali noted that Engelhard had experienced a recent increase in problems, which resulted in his medications being changed.   (Tr. 1187.)

The ALJ stated that he was assigning Dr. Murali's opinions "little weight because they are neither consistent with nor supported by the evidence, including Dr. Murali's own treatment notes."   (Tr. 25.)   The ALJ also indicated that he was discrediting Dr. Murali's opinions because he had seen Engelhard only three times when he provided the May 4, 2012 opinion.   (Tr. 26.) Finally, the ALJ stated that Dr. Murali's opinion is undermined by the fact that Dr. Murali is the in-house psychiatrist for "the independent group home where the claimant lives; therefore, Dr. Murali may be motivated to help recoup money for the care provided to the claimant."   (Tr. 26.)

The regulations require that a treating source's opinion be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record."   20 C.F.R. § 416.927(c)(2).   However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole."   *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). An ALJ may discount or disregard the opinion of a treating physician where other medical assessments are supported by better medical evidence, or where the treating physician renders inconsistent opinions that undermine his credibility.   *Id.* at 897-98.

In support of his finding that Dr. Murali's opinions conflict with his own treatment notes,

the ALJ cites two examples from visits that occurred after Dr. Murali rendered his first opinion. The ALJ notes that on June 26, 2012, Dr. Murali found that Engelhard's mood and sleep were good, that he was cooperative with appropriate thought content and general cognition, he was fully oriented with a euthymic affect, and he had no suicidal or homicidal ideation. (Tr. 25-26, 1161.) The ALJ next notes that on September 4, 2012, Dr. Murali assessed a GAF score of 70-80,[7] which indicates only mild symptoms, at most. (Tr. 26, 1160.) While this is accurate, it is also consistent with Dr. Murali's statement in his April 29, 2013 opinion that Engelhard's highest GAF score in the past year was 70-80. (Tr. 1181.)

The ALJ provides no other examples of how Dr. Murali's opinions conflict with his own treatment notes. The handwritten notes Dr. Murali provides are difficult to read and, in some cases, are illegible. The treatment notes reveal that Dr. Murali frequently found that Engelhard's affect and mood were depressed and/or anxious (Tr. 1142, 1141, 1160, 1162), his judgment was fair (Tr. 1142, 1160), and his memory was fair (1140, 1141). Although Dr. Murali's treatment notes do not provide much detail, they are not inconsistent with his opinions.

Notably, although the ALJ found that Dr. Murali's opinions were not supported by the evidence, he provides no explanation as to how Dr. Murali's opinions conflict with the other medical evidence of record. The record reveals that Engelhard has a long-standing history of treatment for depression. Engelhard was hospitalized from February 25, 2009, through March 2, 2009, at St. Joseph Health Center with increased depression and a desire to hurt himself. (Tr. 883.) Upon discharge, Engelhard was diagnosed with adjustment disorder with a GAF score of

---

[7]A GAF score of 71 to 80 denotes "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily failing behind in schoolwork)." *See DSM IV-TR* at 34.

50.  (Tr. 885.)   He was prescribed Celexa.[8]   *Id.*   Engelhard was admitted at the VA from March 5, 2009 through March 19, 2009, due to complaints of depression and suicidal ideations, including a suicide attempt by hanging himself.   (Tr. 509, 607.)   Engelhard was assessed a GAF score of 50 upon discharge.  (Tr. 509.)   He was discharged to his daughter's house.  (Tr. 607.)   Engelhard subsequently received outpatient treatment for his mental impairments at the VA.   On April 3, 2009, Engelhard reported that he was more anxious and irritable since his discharge.   (Tr. 607.) He was assessed a GAF score of 50.  (Tr. 609.)   On May 1, 2009, Engelhard remained depressed but felt his medications helped.  (Tr. 593.)   Engelhard's hygiene was "fair."   *Id.*   He was assessed a GAF of 55.  (Tr. 594.)   On July 9, 2010, Engelhard remained depressed and was assessed a GAF score of 50.  (Tr. 854.)   He was assessed a GAF score of 55 on October 15, 2009, and December 18, 2009.   (Tr. 837, 827.)   On April 7, 2010, July 21, 2010, October 15, 2010, and March 9, 2011, Engelhard reported that he remained depressed, and was assessed a GAF score of 50.  (Tr. 817-19, 868-71, 1005-09, 1000-01.)   As previously discussed, Engelhard was admitted at the VA hospital from August 30, 2011, through September 20, 2011, due to suicidal and homicidal ideation.   (Tr. 941.)

The above medical evidence reveals Engelhard received significant treatment for depression and was routinely assigned GAF scores in the 50-55 range, consistent with Dr. Murali's opinions and GAF scores.   Although GAF scores do not have a direct correlation to SSA severity requirements, they may be considered in reviewing an ALJ's determination that a treating source's opinion was inconsistent with the treatment record.   *Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013).

---

[8]Celexa is an antidepressant drug indicated for the treatment of depression.  *See* WebMD, http://www.webmd.com/drugs (last visited February 3, 2016).

The only other opinion evidence in the record is the opinion of state agency psychologist Robert Cottone, Ph.D. Dr. Cottone completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment on July 8, 2009, based on a review of the record. (Tr. 783-93, 794-96.) Dr. Cottone expressed the opinion that Engelhard had mild limitations in his activities of daily living; moderate limitations in his ability to maintain social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration. (Tr. 791.) Dr. Cottone found that Engelhard must avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, close proximity to co-workers, and close proximity to available controlled substances. (Tr. 796.) Dr. Cottone stated that Engelhard is able to understand, remember, carry out and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to ordinary changes in a work routine or setting. *Id.*

The ALJ stated that Dr. Cottone "is a mental health specialist whose opinion is consistent with and supported by the other medical evidence of record," and accordingly assigned his opinion "significant weight." (Tr. 25.) Dr. Cottone completed his statement on July 8, 2009, less than five months into the relevant time period in this case, which exceeds four years. Dr. Cottone did not examine Engelhard. Significantly, Engelhard was not living at Harvester at the time Dr. Cottone rendered his opinion. In addition, Dr. Cottone did not have evidence of Engelhard's two subsequent psychiatric admissions. Dr. Cottone's opinion may have been consistent with the limited evidence available to him at the time he provided his opinion. However, in the absence of other medical evidence inconsistent with Dr. Murali's opinion, Dr. Cottone's opinion by itself is not sufficient evidence to discredit Dr. Murali's opinion. *See Shontos v. Barnhart*, 328 F.3d 418,

427 (8th Cir. 2003) ("The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole.").

The ALJ next indicated that he was discrediting Dr. Murali's opinion because he had only seen Engelhard three times when he provided the May 4, 2012 opinion. (Tr. 26.) Defendant states that she "agrees with Plaintiff in that the second reason given by the ALJ for affording lesser weigh to Dr. Murali's opinion, namely that she had only examined Plaintiff three times at the time she submitted her first medical source statement, was not a basis to afford her opinion lesser weight." (Doc. 18 at 14.) Defendant argues that this error does not render the ALJ's ultimate decision to afford lesser weight to Dr. Murali's opinion improper so long as other grounds support the ALJ's determination. The Court agrees that this reason cited by the ALJ for discrediting Dr. Murali's opinion was not a sufficient basis to discredit Dr. Murali's opinion.

The ALJ's final reason for discrediting Dr. Murali's opinion was that he is the in-house psychiatrist for Harvester and, as such, "may be motivated to help recoup money for the care provided to the claimant." (Tr. 26.) Defendant acknowledges that there was no direct evidence of financial motivation on the part of Dr. Murali, but argues that the ALJ was not unreasonable to raise the possibility due to statements made by other Harvester staff members regarding their desire to assist Engelhard in obtaining benefits to pay for his care. Defendant further argues that the ALJ's first articulated reason for affording Dr. Murali's opinion—that her opinion was inconsistent with the medical evidence, including his own treatment notes—was sufficient to afford Dr. Murali's opinion less than controlling weight.

The undersigned disagrees. As acknowledged by Defendant, there was no direct evidence of any financial motivation on the part of Dr. Murali. Dr. Murali, unlike the Harvester

administrators Defendant references, is a medical doctor and specialist in psychiatry, who treated Engelhard for more than one year. The ALJ's assertion that Dr. Murali may be improperly motivated by financial concerns is merely speculation.

Further, the undersigned has found that the ALJ's other cited reasons for discrediting Dr. Murali's opinions are unsupported by substantial evidence. Dr. Murali is Engelhard's treating psychiatrist and is the only professional who expressed an opinion on Engelhard's limitations based on a complete record. If the ALJ questioned Dr. Murali's motivations or otherwise had doubts about his opinions, the ALJ should have obtained a consultative examination from a different mental health provider. *See Ellis v. Barnhart,* 392 F.3d 988, 994 (8th Cir. 2005) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record").

## V. Conclusion

For the reasons discussed above, the Commissioner's decision is not based upon substantial evidence on the record as a whole and the cause is therefore remanded to the Commissioner for further consideration in accordance with this Memorandum and Order. Upon remand, the ALJ shall consider Engelhard's daily activities since residing at Harvester, consider whether Engelhard meets the "C" criteria under listing 12.04 due to his residence at Harvester, properly weigh the opinion of Dr. Murali, and further develop the record, if necessary, by obtaining additional medical evidence regarding Engelhard's ability to function in the workplace.


_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of March, 2016.